# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

DARRELL EDWARD SMITH, )
)
    Plaintiff, )
)
v. ) Case No. 4:17-cv-02055-JHE
)
COMMISSIONER OF SOCIAL SECURITY, )
)
    Defendant. )

## MEMORANDUM OPINION[1]

Plaintiff Darrell Edward Smith ("Smith") seeks review, pursuant to 42 U.S.C. § 405(g), § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying his application for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI").[2] (Doc. 1). Smith timely pursued and exhausted his administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. Factual and Procedural History

Smith protectively filed an application for a period of disability and DIB on October 15, 2014, and an application for SSI on November 5, 2014, alleging he became unable to work beginning July 10, 2014. (Tr. 204-219). The Agency initially denied Smith's application and

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 13).

[2] The judicial review provisions for DIB claims, 42 U.S.C. § 405(g), apply to claims for SSI. *See* 42 U.S.C. § 1383(c)(3).

1

Smith requested a hearing, where he appeared on October 19, 2016. (Tr. 62-80). After the hearing, the Administrative Law Judge ("ALJ") denied Smith's claim on January 31, 2017. (Tr. 45-57). Smith sought review by the Appeals Council, but it denied his request on October 6, 2017. (Tr. 1-7). On that date, the ALJ's decision became the final decision of the Commissioner. On December 8, 2017, Smith initiated this action. (*See* doc. 1).

Smith was thirty-nine on his hearing date. (Tr. 66). Smith has an eighth-grade education and past relevant work as a CNC machinist. (Tr. 55, 66-68).

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This Court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528,

---

[3] In general, the legal standards applied are the same whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4) whether the claimant can perform his or her past work; and
(5) whether the claimant is capable of performing any work in the national economy.

---

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499.

3

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

## IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Smith last met the insured status requirements of the Social Security Act on December 31, 2019 and had not engaged in substantial gainful activity after his alleged onset date of July 10, 2014. (Tr. 47). At Step Two, the ALJ found Smith has the following severe impairments: hypertensive heart disease, hypertrophic cardiomyopathy status post left ventricular myomectomy and mitral valve replacement with placement of a pacemaker/implantable cardioverter defibrillator (ICD), hypertension, status post cerebrovascular accident, diabetes mellitus, anxiety, and depression. (Tr. 47). At Step Three, the ALJ found Smith did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 48).

Before proceeding to Step Four, the ALJ determined Smith's residual functioning capacity ("RFC"), which is the most a claimant can do despite his impairments. *See* 20 C.F.R. §

4

404.1545(a)(1). The ALJ determined that, through his date last insured ("DLI"), Smith had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can only occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolding; the claimant can occasionally balance, stoop, kneel, crouch, and crawl; the claimant should avoid all work at unprotected heights; the claimant should have only occasional contact with the general public.

(Tr. 50).

At Step Four, the ALJ determined that, through his DLI, Smith was unable to perform any past relevant work. (Tr. 55). At Step Five, the ALJ made the alternative determination, based on Smith's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Smith could perform, including document preparer, loader, and assembler. (Tr. 56). Therefore, the ALJ determined Smith has not been under a disability and denied his claim. (Tr. 56).

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or if improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Smith raises two arguments, both tied to evidence he submitted to the Appeals Council. First, he contends the Appeals Council erred when it failed to review new evidence he submitted with his claim. (Doc. 10 at 12). Specifically, Smith submitted an independent medical evaluation from Dr. Jarrod Warren dated May 12, 2017, (tr. 9-13), a psychological evaluation from Dr. David

R. Wilson dated April 11, 2017, (tr. 14-22), and records from the CED Mental Health Center dated February 3, 2017, through February 6, 2017, (tr. 32-41). The Appeals Council declined to consider this evidence because it "does not relate to the period at issue" and thus "does not affect the decision about whether [Smith was] disabled beginning on or before January 31, 2017."[5] (Tr. 2). Second, he argues the ALJ's decision was not based on substantial evidence considering the submissions to the Appeals Council. (Doc. 10 at 25).

### A. The Appeals Council Did Not Err in Declining to Consider Smith's New Evidence

"With a few exceptions, the claimant is allowed to present new evidence at each stage of this administrative process," including before the Appeals Council. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. 404.900(b)). The Appeals Council must review a case if it receives additional evidence that is new, material, and chronologically relevant. 20 C.F.R. § 404.970(a)(5); *Ingram*, 496 F.3d at 1261. "[W]hether evidence meets the new, material, and chronologically relevant standard is a question of law subject to . . . *de novo* review," and an erroneous failure to consider such evidence warrants remand. *Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). New evidence is noncumulative evidence that was not previously presented to the ALJ, and that evidence is material when "there is a reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). Evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." *Foster v. Colvin*, No. 12-CV-4038-VEH, 2014 WL 1338095, at *4 (N.D. Ala. Mar. 28, 2014) (citing 20 C.F.R. § 404.970(b)). Even records that postdate the ALJ's decision may be

---

[5] The Appeals Council did not, as Smith indicates, reject the evidence because it was "dated after the ALJ's decision," (doc. 10 at 15).

6

chronologically relevant when they assess the conditions that existed prior to the decision and there is no evidence of deterioration. *Washington*, 806 F.3d at 1322.

Smith makes no actual argument for why the <u>specific</u> evidence he presented to the Appeals Council is new, material, or chronologically relevant. Instead, he recaps his medical records, (*id.* at 12-15), provides a synopsis of the Appeals Council's rationale for refusing to consider his new evidence, (*id.* at 15), blockquotes cases where courts remanded claims to the Commissioner when the Appeals Council erroneously failed to consider evidence, (*id.* at 15-23), and cites the legal standard as a general proposition, (*id.* at 24-25). The only *analysis* before the court is the Commissioner's, contending the Appeals Council appropriately denied Smith's request for review.[6] (Doc. 12). Therefore, while the undersigned scrutinizes the entire record to determine whether the Appeals Council erred, the lens through which this scrutiny is focused is the Commissioner's arguments.

Implicitly conceding the evidence is new, the Commissioner argues the new evidence is not chronologically relevant, (doc. 12 at 6-12), nor is it material, (*id.* at 13-15). For clarity, the undersigned addresses each of these arguments in the context of the piece of evidence in question.

**1. Dr. Warren's Medical Evaluation**

Dr. Warren evaluated Smith on May 12, 2017. (Tr. 9). Dr. Warren described Smith's medical history, noting he had a "long-standing history of Idiopathic Hypertrophic Subaortic Stenosis" dating back to January 17, 2005. (*Id.*). This condition caused Smith to experience chest pain and palpitations over the next several years, and Smith was eventually admitted to the hospital on January 18, 2011 for left ventricular outflow tract myomectomy and mitral valve replacement.

---

[6] Although Smith has submitted a reply brief, (doc. 14), it is simply copied-and-pasted excerpts from his brief in support of disability.

7

(*Id.*). An ICD implantation was performed on January 21, 2011, prior to Smith's discharge. (*Id.*). Smith did well for the first month, but in February 2011 developed severe dizziness and near syncope in February 2011. (*Id.*). Smith continued to have dizziness, nausea, and headaches, and eventually an EEG and CT angiogram of the head and neck were ordered. (*Id.*). Smith was found to have a cerebellar lesion consistent with an old stroke, and his dizziness was suspected to be secondary to that lesion. (*Id.*). Smith was started on an anticoagulant, but his INR[7] was difficult to manage and his neurologist believed that that inconsistency likely contributed to Smith's stroke. (*Id.*). Smith also began experiencing anxiety associated with his dizziness. (*Id.*). Smith developed anxiety attacks related to his concern about a recurrent stroke and concern for worsening dizziness. (*Id.*). Dr. Warren characterized Smith as disappointed he could no longer work. (Tr. 9-10). Dr. Warren noted Smith had been under the care of CED Mental Health Center and Gadsden Psychological Services. (Tr. 10).

Dr. Warren's physical exam revealed "dizziness noted with positional change witnessed during exam" and "dizziness noted when patient was bent over touching toes." (Tr. 11). The latter of these caused Smith to "nearly [fall] over upon standing back up." (*Id*.). Smith's other examination results were unremarkable. (Tr. 10-11).

Dr. Warren's impression was IHSS with AICD and chronic anticoagulation, cerebellar CVA with recurring dizziness, general anxiety disorder with panic attacks, HTN, diabetes, and obesity. (Tr. 11). Dr. Warren indicated that since Smith's surgery, "he continues to experience significant dizziness that occupies up to 75% of his days sometimes," only relieved with rest. (Tr.

---

[7] "INR" stands for "international normalized ratio," an expression of how quickly a person's blood clots. *Prothrombin time test,* THE MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/prothrombin-time/about/pac-20384661 (last visited September 17, 2019).

8

12). According to Dr. Warren, Smith's issues "date back to 2/19/2011 when he began experiencing the debilitating dizziness that has impaired him since." (*Id*.).

Dr. Warren also completed a physical capacities evaluation that indicated Smith was limited by "Severe dizziness secondary to cerebellar infarction secondary to fluctuating INR follow [sic] heart surgery for IHSS." (Tr. 13). According to the evaluation, Smith can sit upright in a standard char for 3-4 hours and stand for 1-2 hours. (*Id.*). Dr. Warren would expect Smith to spend 4 out of 8 hours lying down, sleeping, or sitting with legs propped up, to be off task 75% of the time during a workday, and miss 20 out of 30 days due to his physical symptoms. (*Id.*). Dr. Warren indicated Smith's limitations existed back to February 9, 2011. (*Id.*).

The Commissioner contends Dr. Warren's opinion is not chronologically relevant. The Commissioner centers this argument around the Eleventh Circuit's recent decision in *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302 (11th Cir. 2018) (doc. 12 at 8). In *Hargress*, as in this case, the court considered whether the Appeals Council was required to consider evidence submitted after an ALJ's decision. The plaintiff in that case pointed the Eleventh Circuit towards its decision in *Washington*, *supra*, for the proposition that the court had "recognized that medical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant."[8] *Id.* at 1309 (quoting *Washington*, 806 F.3d at 1322). The *Hargress* court noted that *Washington* explicitly limited its holding to its "specific circumstances," where "(1) the claimant described his . . . symptoms during the relevant period to the [physician], (2) the [physician] had

---

[8] Smith block quotes *Washington* for the general proposition that "when the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate[.]" (Doc. 10 at 16) (emphasis removed).

reviewed the claimant's . . . health treatment records from that period, and (3) there was no evidence of the claimant's . . . decline since the ALJ's decision." *Id.*

Although Dr. Warren's report does indicate Smith reported ongoing symptoms from 2012 through the date of the report, indicating Smith described "symptoms during the relevant period," neither of the remaining *Washington* circumstances are present in Dr. Warren's opinion. Although Dr. Warren indicated his review of Smith's history was "[b]ased on [Smith's] records," there is no indication that Dr. Warren actually reviewed any records from the relevant time period: July 10, 2014 (Smith's onset date) to January 31, 2017 (the date of the ALJ's decision). Instead, Dr. Warren's review appears to have begun with records from January 17, 2005, and ended with records from February 2011. Smith does not indicate why these would bear on his condition during the period at issue. *See Santos v. Soc. Sec. Admin., Comm'r*, 731 F. App'x 848, 856 (11th Cir. 2018) (finding records that predated claimant's disability date "of limited relevance" to the claim). Dr. Warren seems to have relied on Smith's subjective reports going forward from February 2011.[9] The record does reflect that Dr. Warren briefly treated Smith on November 10, 2015, when Smith was admitted to the Gadsden Regional Medical Center on his reports of dizziness and lightheadedness, (tr. 693), but Dr. Warren does not reference those treatment notes or even acknowledge a prior treating relationship. None of this is sufficient to demonstrate Dr. Warren reviewed Smith's records from the relevant period. *See Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966, 969 (11th Cir. 2018) (finding later-submitted evidence not chronologically relevant where physician "did not discuss his findings in relation to [the claimant's] earlier medical records

---

[9] The lone exception to this is Dr. Warren's brief reference to CED Mental Health Center and Gadsden Psychological Services. However, those records postdate the relevant time period and are also not chronologically relevant, as discussed further below.

and treatment" and it did not appear to be based on that material); *Hargress*, 883 F.3d at 1309-10. Indeed, as the Commissioner discusses, Dr. Warren's proposed limitations dating back to 2011 appear to have ignored the fact that Smith returned to work in 2012 and worked full-time as a machinist until he lost his job in 2014, calling into serious doubt whether he reviewed Smith's complete medical record. (Doc. 12 at 9) (citing tr. 486 (June 11, 2012 treatment record noting Smith was "back to work"), 644 (February 9, 2012 treatment record noting Smith "works as a machinist").

Smith's subjective complaints also represent a deterioration in his condition following the ALJ's decision. (Doc. 12 at 10). The Commissioner points to Smith's dizziness to the point of falling over on examination, contending Smith failed to cite any records showing it was present at any prior examination. (*Id.*). The record does reflect some instances where Smith reported dizziness, but none to the extreme and disabling degree Dr. Warren's 2017 exam indicated. For example, as noted above, Smith was seen by Dr. Warren on November 10, 2015. (Tr. 693). Smith was admitted for evaluation and evaluated by other physicians. Dr. John Just evaluated Smith on his admission date and characterized Smith's chief complaint as "headache, spotted vision." (Tr. 695). Smith's motor functions were normal on examination, with no mention of distress or dizziness. (Tr. 696). Dr. Sarah Latif performed a further examination on November 10, 2015, noting Smith had complained of dizziness. (Tr. 698). Her examination revealed Smith was positive for dizziness, lightheadedness, and near syncope, but there was no mention of any physical reflection of these symptoms (e.g., falling over). (Tr. 699). At Dr. John's request, a CT scan without contrast of Smith's head was performed. (Tr. 701). Apart from Smith's chronic infarct in the left cerebellar hemisphere (i.e., the stroke's aftermath), the CT scan revealed no acute intracranial abnormality. (*Id.*). Smith was prescribed medication, and his symptoms generally

11

improved over his three-day hospital stay. (Tr. 693). On another occasion, January 5, 2016, Smith reported dizziness, possibly related to blood sugar problems. (Tr. 793). There was no indication at that visit that Smith's musculoskeletal or neurologic functions were affected by his dizziness. (Tr. 793-96). Approximately two months later, on February 23, 2016, Smith again sought treatment for dizziness, but again his physical examination was unremarkable. (Tr. 841). Considering these repeated and relatively unremarkable physical findings, Dr. Warren's examination reveals a worsening of Smith's symptoms at odds with the *Washington* criteria. Because Dr. Warren's opinion fails that test, the Appeals Council did not err in finding it was not chronologically relevant (i.e., that it "does not relate to the period at issue").

Even if it were chronologically relevant, though, Dr. Warren's report is not material; in other words, it would not change the administrative result if it were considered, *Hargress*, 883 F.3d at 1310. (Doc. 12 at 12-15). The Commissioner argues Dr. Warren did not treat Smith during the relevant period, and so his opinion is not entitled to any particular weight. (*Id.* at 13-14). As noted above, however, Dr. Warren did treat Smith on November 10, 2015. (Tr. 693). However, this was a one-time encounter, and the record does not reflect that Dr. Warren ever saw Smith again until the post-decision examination. Given this, the Commissioner is correct that Dr. Warren's opinion is not that of a treating physician, and the Commissioner would owe no deference to that opinion if it had been considered. *See Eyre v. Comm'r, Soc. Sec. Admin.*, 586 F. App'x 521, 523 (11th Cir. 2014) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)) ("The ALJ owes no deference to the opinion of a physician who conducted a single examination: as such a physician is not a treating physician."). Further, Dr. Warren's post-ALJ findings are inconsistent with treatment notes and records from the relevant period (including his own), which reflect dizziness, but not to the debilitating extent indicated by Dr. Warren's function report. *See*

12

*Hargress*, 883 F.3d at 1310 (physician's opinion not material when it contradicted his own records and other records created during the relevant time period). Since Dr. Warren's opinion is immaterial in addition to being chronologically irrelevant, the Appeals Council was not required to consider it.

### 2. Dr. Wilson's Psychological Evaluation

Smith's second set of records is a psychological evaluation from Gadsden Psychological Services. (Tr. 14-22). Dr. Wilson performed this psychological evaluation on April 11, 2017, (tr. 14-21), and completed a medical questionnaire the next day, (tr. 22). Dr. Wilson indicated Smith's attorney "had provided extensive summaries of his medical records and these were reviewed," but that they "mainly documented his ongoing cardiac issues." (Tr. 14). Dr. Wilson noted he had seen Smith for three sessions in March, May, and June of 2012. (*Id.*). After recapping Smith's medical issues, (tr. 14-15), and discussing Smith's reports of his personal life, legal issues, alcohol and drug history, and educational and occupational history, (tr. 16-17), Dr. Wilson described his clinical interview and Smith's mental status. Dr. Wilson considered Smith's affect within normal limits and noted his thought processes were grossly intact, but that Smith did seem to have minor struggles with finding the right word. (Tr. 17). Smith reported anxiety, a fear of dying, some obsessive-compulsive tendencies, depression, and poor energy. (Tr. 17-18). Dr. Wilson also indicated Smith's report of daily activities included fixing breakfast and watching TV, but that Smith did not walk or get exercise because "the last time [he] walked [for a mile and a half] to try to be healthier it landed [him] in the hospital for 2 or 3 days." (Tr. 18).

Dr. Wilson administered cognition and memory screening tests, finding poor mental control and attention, mild problems with short term memory and working memory, and average acquired information. (Tr. 18-19). Smith was also given the MMPI II, which resulted in a valid profile with no indication of malingering. (Tr. 19). The MMPI II revealed "serious somatic

complaints and concerns" indicating depression; a "very disturbed MMPI profile." (Tr. 19). Dr. Wilson concluded Smith's "severe depression and problem with anxiety and panic attacks would . . . greatly impair his ability to work." (Tr. 20).

On his mental health source statement, Dr. Wilson indicated Smith could understand, remember, and carry out simply instructions and maintain socially appropriate behavior, but could not: maintain attention, concentration, and/or pace for periods of at least two hours; perform activities within a schedule and be punctual within customary tolerances; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; interact with supervisors; or interact appropriately with coworkers. (Tr. 21). Dr. Wilson opined Smith would be off-task during 75% of an 8-hour day and would miss more than 20 days in a 30-day period due to his psychological symptoms. (*Id.*). Dr. Wilson indicated that the limitations had existed back to July 10, 2014. (*Id.*).

As with Dr. Warren's opinion, Dr. Wilson's opinion does not appear to be chronologically relevant under *Washington* and *Hargress*. While, again, Smith appears to have reported symptoms that occurred during the relevant period, Dr. Wilson's report fails the other two *Washington* criteria. Although Dr. Wilson stated he reviewed Smith's medical records from the relevant period, there is nothing in his report that indicates its conclusions were <u>based</u> on those records. To the contrary, Dr. Wilson's only discussion of medical records indicates they were mostly related to Smith's cardiac issues rather than psychological issues, and his recap of Smith's medical history appears to have been derived from Smith's reports during the interview. Dr. Wilson does not reference any psychological evaluation in the record. To the extent Dr. Wilson reviewed his own medical notes from Smith's sessions in 2012, that is prior to the relevant time period. *See Santos*, 731 F. App'x at 856; *Ring*, 728 F. App'x at 969.

14

Further, Dr. Wilson's opinion represents a decline in Smith's mental health. As the Commissioner points out, Smith consistently displayed normal mental symptoms when he was evaluated for other complaints during the relevant time period. (*See, e.g.,* tr. 782, 791, 813, 836, 841, 846, 850 & 857). Smith's psychological symptoms were specifically considered in a December 2014 mental evaluation by Dr. Jack L. Bentley. (Tr. 683). Dr. Bentley found Smith had a reasonably cheerful mood with no obvious evidence of anxiety or restlessness and no indications of phobias, obsessions, or unusual behaviors. (*Id.*). Smith indicated his daily activities included yard work, watching television, and taking short walks. (Tr. 684). Dr. Bentley diagnosed Smith with Depressive Disorder, but concluded Smith had a favorable prognosis with moderate limitations in Smith's ability to sustain complex or repetitive work-related activities and mild impairment in simple tasks and effective communication with coworkers and supervisors. (*Id.*). Dr. Bentley stated that "[m]ost of [Smith's] work related restrictions stem from his previously described health problems." (*Id.*). There is no record evidence between Dr. Bentley's evaluation and the ALJ's decision that would support the much more significant limitations in both work-related activities and communication indicated by Dr. Wilson's report. Since Dr. Wilson's opinion reflects a decline in Smith's mental health since the date of the ALJ's decision and does not appear to be based on any records from the relevant time period, the Appeals Council did not err by finding it not chronologically relevant.

Because Dr. Wilson's opinion clashes with the record evidence from the relevant period, it is also immaterial. As stated above, the limitations Dr. Wilson indicates are substantially more restrictive than the medical evidence supports and his findings are inconsistent with Smith's psychological symptoms during the relevant time period. *See Hargress*, 883 F.3d at 1310. Since there is no support in the record for those limitations, there is no reasonable possibility the

administrative result would change if Dr. Wilson's opinion had been considered. Accordingly, the Appeals Council was not required to consider Dr. Wilson's opinion.

### 3. CED Mental Health Center Notes

Smith's final piece of evidence is a collection of records from the CED Mental Health Center, dated February 3, 2017 through February 6, 2017. (Tr. 32-40). These records generally support that Smith sought treatment for anxiety, depression, isolation, and irritability, and was ultimately diagnosed with Major Depressive Disorder. (*Id.*). However, these records are not chronologically relevant because nothing indicates they were based on symptoms during the relevant time period or were based on treatment records from the relevant time period. *Hargress*, 883 F.3d at 1309-10. And they also reflect that Smith was "recently much more depressed after being denied disability for the 2nd time," (tr. 32), which indicates his condition had deteriorated since the ALJ's decision.

Even if they were chronologically relevant, the records are also immaterial because they do not support limitations greater than those imposed by the ALJ; in fact, the treating physician's sole recommendations were "PMA [i.e., positive mental attitude], individual therapy." (Tr. 40). There is no suggestion in them that Smith's Major Depressive Disorder creates any limitations in his ability to work. Because they are neither material nor chronologically relevant, the Appeals Council was under no obligation to consider the CED Mental Health Center records.

### B. Since the Appeals Council Did Not Err by Declining to Consider the Records, the Court Is Not Required to Evaluate the ALJ's Decision in Light of Them

Smith's second argument is that the denial of benefits was not based on substantial evidence because the Appeals Council refused to consider his evidence. (Doc. 10 at 25). To support this, Smith cites *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007), for the proposition that a reviewing court must consider evidence not submitted to the ALJ but

reviewed by the Appeals Council in determining whether the Commissioner's decision was based on substantial evidence. (*Id.*). Since the Appeals Council did not err by not considering the evidence, there is no basis for the court to now consider it on review. *See Ingram*, 496 F.3d at 1258 ("a federal district court must consider evidence not submitted to the administrative law judge but <u>considered by the Appeals Council</u> when that court reviews the Commissioner's final decision denying Social Security benefits.") (emphasis added).

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Smith's claim for a period of disability, DIB, and SSI is **AFFIRMED**, and this action is **DISMISSED WITH PREJUDICE**. A separate order will be entered.

DONE this 30th day of September, 2019.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE